UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


UNITED STATES OF AMERICA,     )  CASE NO:  1:16-MJ-03621-KK
                              )
              Plaintiff,      )          CRIMINAL
                              )
     vs.                      )    Albuquerque, New Mexico
                              )
DANIEL M. SCHIFFMILLER,       )    Monday, October 24, 2016
                              )    (11:58 a.m. to 12:49 p.m.)
              Defendant.      )
_____)


PRELIMINARY / DETENTION HEARING


BEFORE THE HONORABLE KIRTAN KHALSA,
UNITED STATES MAGISTRATE JUDGE


Appearances:              See Next Page

Court Reporter:           Recorded; Liberty - Gila

Clerk:                    E. Hernandez

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES FOR:**</u>


Plaintiff:                    GEORGE C. KRAEHE, ESQ.
                              U.S. Attorney's Office
                              District of New Mexico
                              P.O. Box 607
                              Albuquerque, NM 87103


Defendant:                    JOHN V. BUTCHER, ESQ.
                              Office of the Federal Public Defender
                              First State Bank Building
                              111 Lomas Boulevard NW
                              Suite 501
                              Albuquerque, NM 87102

U.S. Probation/Pretrial: A. Galaz

3

## INDEX

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ANTHONY CIPRIANO | 5/21 | 11/31 | | |

| GOVERNMENT'S EXHIBIT | | | | RECEIVED |
|---|---|---|---|---|
| 1 | | | | 25 |

4

1    **Albuquerque, New Mexico; Monday, October 24, 2016; 11:58 a.m.**

2                      **(Call to Order)**

3          **THE COURT:**  I will call *United States of America*

4    *versus Daniel M. Schiffmiller.*

5          **MR. KRAEHE:**  Good morning, your Honor.  George Kraehe

6    for the United States.

7          **THE COURT:**  Good morning.

8          **MR. BUTCHER:**  Good morning again, your Honor.  John

9    Butcher on behalf of Mr. Schiffmiller, who appears in person.

10   Also, his parents are in the audience.  The case is for a

11   hearing, your Honor.

12         **THE COURT:**  Okay.  All right.  We're set for a

13   preliminary hearing on the criminal complaint.  Is the

14   Government ready to call its first witness?

15         **MR. KRAEHE:**  Yes, your Honor.  The United States

16   calls Special Agent Tony Cipriano.

17         **THE CLERK:**  Please raise your right hand.

18        **ANTHONY CIPRIANO, GOVERNMENT'S WITNESS, SWORN**

19         **THE CLERK:**  Please have a seat.  State your name and

20   spell your last name for the record.

21         **THE WITNESS:**  My name is Anthony Cipriano,

22   C-I-P-R-I-A-N-O.

23   //

24   //

25   //

1                    **DIRECT EXAMINATION**

2    **BY MR. KRAEHE:**

3    Q    Sir, you're currently employed where?

4    A    At the FBI assigned to the Santa Fe Resident Agency.

5    Q    How long have you been employed there?

6    A    Four and a half years.

7    Q    And how long have you been employed with the FBI?

8    A    Four and a half years.

9    Q    And what is -- what is your job?

10   A    I'm a special agent.

11   Q    Okay.  And are there any particular kinds of crimes or

12   investigations you're involved in?

13   A    I investigate matters pertaining to counterterrorism.

14   Q    Did you have occasion to be involved in an investigation

15   involving Daniel Schiffmiller?

16   A    Yes.

17   Q    And do you recognize Mr. Schiffmiller here in the

18   courtroom today?

19   A    Yes, I do.

20   Q    And can you tell us where he is?

21   A    Yes; he's sitting directly in front of me next to his

22   attorney wearing a neon colored jumpsuit.

23             **MR. KRAEHE:**  Your Honor, would the record reflect

24   that Special Agent Cipriano has identified the defendant?

25             **THE COURT:**  Any objection?

```
                      Cipriano - Direct / By Mr. Kraehe                6
```

1           **MR. BUTCHER:**  No, your Honor.

2           **THE COURT:**  All right.  The record will reflect that

3    Mr. Schiffmiller has been identified.

4           **(The witness identified the defendant)**

5    **BY MR. KRAEHE:**

6    Q    Are you familiar with the complaint that has been filed

7    against Mr. Schiffmiller in this case?

8    A    Yes, I am.

9    Q    And were you the affiant in the affidavit that was

10   provided in support of that complaint?

11   A    Yes.

12   Q    And that complaint states charges against Mr. Schiffmiller

13   for a violation of what statutes?

14   A    Fifty-eight six one (c) and (d) of Title 26.

15   Q    And what are those violations?

16   A    Possession of a firearm which has been made in violation

17   of Chapter 53 and possession of a firearm that has not been

18   registered.

19   Q    Did you attach a photograph of the firearm in question to

20   the affidavit that you filed in support of the complaint?

21   A    Yes.

22   Q    And can you describe that firearm?

23   A    Yes.  It is a modified shotgun chambered in .410.  It has

24   been cut at the barrel so that it's only the bolt carrier and

25   the barrel which remain.  The bolt carrier assembly actually

1   contains a firing pin.  It's approximately 15 and a half inches

2   in length when combined.

3   Q    And was this firearm tested to establish whether or not it

4   functions as a firearm?

5   A    Yes.  A function test was conducted.

6   Q    Was this firearm, to the best of your knowledge, modified

7   from another firearm?

8   A    Yes.  It was modified from a shotgun.

9   Q    And how long is this firearm that you have a photograph

10  of?

11  A    About 15 and a half inches together.  Each separate

12  component -- the bolt carrier is approximately 7.8 inches; the

13  barrel is approximately 11.7 inches.

14  Q    Okay.  Is there a serial number on this firearm?

15  A    There is not.

16  Q    And can you tell the Court why you believe there is not a

17  serial number on this firearm?

18  A    The firearm was physically examined to determine if there

19  was a serial number, and no serial number was found.

20  Q    Is this firearm made in violation of Chapter 53 of Title

21  26 United States Code?

22          **MR. BUTCHER:**  Objection.

23          **THE WITNESS:**  Yes, sir.

24          **MR. BUTCHER:**  Calls for a legal conclusion.  That's

25  for the Court, not for the witness.

Cipriano - Direct / By Mr. Kraehe                                          8

1          **THE COURT:**  Why don't you rephrase your question.

2          **(Pause)**

3  **BY MR. KRAEHE:**

4  Q    Now, can you tell us where this firearm was found?

5  A    Yes.  It was located in a storage compartment, number L12,

6  in Extra Space Storage in Santa Fe, New Mexico.

7  Q    And do you know who had access to that storage facility?

8          **MR. BUTCHER:**  Lack of foundation.  We don't know how

9  he would know this.

10          **THE COURT:**  All right.

11  **BY MR. KRAEHE:**

12  Q    Did you conduct any investigation to determine whether --

13  what people had access to this storage facility?

14  A    Yes.  I did.

15  Q    And what did you determine in looking into that?

16  A    That two people had access to the storage facility:  Gary

17  Schiffmiller and Daniel Schiffmiller.

18  Q    And did you determine who owned the contents of the

19  storage facility?

20  A    The contents were owned by Daniel Schiffmiller.

21          **MR. BUTCHER:**  Well, again, lack of foundation.  The

22  question was, did he determine that; it would be a "yes" or

23  "no" question.  But to say -- but concluding what he did with

24  the lack of foundation, we object, your Honor.

25          **THE COURT:**  Why don't you ask him how he made that

Cipriano - Direct / By Mr. Kraehe                    9

1  determination.

2  **BY MR. KRAEHE:**

3  Q    How did you determine who had access to this -- who was in

4  possession of the contents of the storage facility?

5  A    On September 14th I interviewed Gary Schiffmiller.  He

6  told me that the storage container was rented for Daniel's

7  exclusive use.  We also interviewed two employees of Extra

8  Space Storage, who indicated that Gary had been present at the

9  time of renting the storage container, but the only person they

10  had seen access it since was Daniel.

11  Q    Okay.  How -- how did one go about accessing the storage

12  unit?  Was there a key or something on --

13  A    There was a pin.

14  Q    All right.  And did you ask Mr. Schiffmiller, Gary

15  Schiffmiller, whether he knew what the pin was to the --

16  A    Can I -- can I ask; did you mean how to access the storage

17  container as in the physical unit, L12, or access the facility?

18  Q    Access the actual storage unit.

19  A    There was a key.

20  Q    Okay.  And did you find out who had the key?

21  A    Yes.

22  Q    Who had the key?

23  A    Daniel -- it was in Daniel M. Schiffmiller -- a vehicle

24  being driven by Daniel Schiffmiller.

25  Q    Did Daniel Schiffmiller ever make any statements as to

Cipriano - Direct / By Mr. Kraehe                    10

1    whether he owned the contents of the storage facility?

2    A    Yes.

3    Q    Okay.  Can you describe for the Court what he said

4    regarding this?

5    A    Yes.  September 14th Daniel was incarcerated at the

6    Santa Fe County Adult Detention Center.  He had a telephone

7    conversation with Gary in which he declared the contents of the

8    storage container to be his property.

9    Q    Did you determine in the course of your investigation

10   whether anyone else claimed ownership of the contents of the

11   storage facility?

12   A    The only persons I'm aware of who had access are Daniel

13   and Gary.

14   Q    Did you investigate whether or not the shotgun, or the

15   firearm that you found in the facility, whether it had been

16   registered?

17   A    Yes.  A records check was conducted by the Bureau of

18   Alcohol (indiscernible; recording cuts out) and disseminated to

19   the U.S. Attorney's office indicating that neither Gary nor

20   Daniel had a firearm registered then that fell under the

21   Natural Firearms Act.

22   Q    All right.  How long was the barrel of the firearm that

23   you found or that is -- that you have a photograph of attached

24   to the complaint?

25   A    Approximately 11.7 inches.

1        **MR. KRAEHE:**  Your Honor, I believe those are all the

2  questions I have.

3        **THE COURT:**  Okay.

4                    **CROSS EXAMINATION**

5  BY MR. BUTCHER:

6  Q    Special Agent, in reviewing the affidavit, I guess a lot

7  of stuff happened on September 14th of this year concerning

8  this case?

9  A    Yes.

10  Q    It would appear -- and please correct me if I'm wrong in

11  this -- is that the conversation between you and Gary

12  Schiffmiller occurred before the conversation between Gary

13  Schiffmiller and Daniel Schiffmiller.  Is that correct?

14  A    Yes.  That's correct.

15  Q    How did you come about to have a conversation with Gary

16  Schiffmiller on the 14th of September?

17  A    I had previously identified Gary as Daniel's father, and I

18  located him at his place of employment and requested an

19  interview.

20  Q    Okay.  What did you talk -- talk about as to -- did you

21  know about the storage locker at that time or -- or was that

22  during the conversation you found out about it?

23  A    I had been aware previously of the storage locker.

24  Q    And what was the -- as to the storage locker, what was the

25  conversation between you and Gary Schiffmiller?

1  A    I asked Gary whether there was a storage -- any other

2  place that Daniel had access to that I might not have knowledge

3  about, and he mentioned the storage container.

4  Q    Now, I'm assuming that you did this because you were

5  concerned of some kind of contraband or illegal substances that

6  Daniel may have?

7  A    Yes.

8  Q    And what was your concern?

9  A    Explosives, particularly.

10  Q    Okay.  Did you ask him specifically about any explosives

11  in the storage locker?

12  A    Daniel or Gary?

13  Q    Gary.  I'm still --

14  A    Gary.

15  Q    I'm sorry.  I'm still talking about Gary at the moment.

16  A    Yeah.

17  Q    What was the response?

18  A    He wasn't aware of any explosives.

19  Q    Now, there was a call between Gary and Daniel on the same

20  date that you got access to -- was that done in front of you or

21  did you get the tapes later?

22  A    I got the tapes later.

23  Q    Okay.  And can you tell us about the substance of that

24  phone call?

25  A    Of the conversation between --

Case 1:16-cr-04360-MCA  Document 13  Filed 10/31/16  Page 13 of 46


Cipriano - Cross / By Mr. Butcher                    13

1   Q    Gary and Daniel --

2   A    Gary and Daniel?

3   Q    -- Schiffmiller.  For the sake of clarity, I'll just use

4   the first names.

5   A    Okay.  Yeah, so, the -- Gary was asking Daniel that --

6   telling Daniel that the FBI was requesting access to the

7   storage container and consent, and he was asking Daniel what he

8   would find in the storage container.

9   Q    And what did Daniel -- what did Daniel say?

10  A    He said, "They'll find my property."

11  Q    Was there anything -- well, that was a storage locker;

12  wouldn't that be what would be in there, his property?

13  A    Correct.

14  Q    Did you take "my property" -- I noticed you quoted "my

15  property" in the complaint.  Did you mean to infer that meant a

16  code or something?

17  A    No.  I just meant to infer that the contents of the

18  storage container belonged to Daniel.

19  Q    Okay.  Did Daniel in that conversation suggest that there

20  might be any kind of contraband in there?

21  A    No.  Not to my knowledge.

22  Q    Did Gary ask him if there was any type of explosives or

23  contraband in there?

24  A    I only listened to a segment of the conversation, not the

25  conversation in its entirety.

Cipriano - Cross / By Mr. Butcher                    14

1  Q     Okay.

2  A     For that particular part.

3  Q     Okay.  At some point you searched that storage container,

4  which is, I think you said, L -- L12?

5  A     Correct.

6  Q     What did you find in there?

7  A     We found numerous items pertaining to the manufacture of

8  explosives and explosive devices, in addition to the firearm.

9  Q     Like -- like what?  I mean, you're talking books?  You're

10 talking chemicals?

11 A     I'm talking precursor chemicals, energetic substances

12 which could not be identified on scene and had to be

13 transported for laboratory testing; books and written documents

14 indicating an interest in explosives; and different electrical

15 components that could suffice as triggers or initiators for an

16 explosive; containers which could contain an explosive; and

17 many other pieces of evidence.

18 Q     All right.  Let's bore down on it a little bit.

19 Another -- another case that I've had like this, precursor

20 chemicals had been, like, in one case, sugar.  So, are we

21 talking, like, sugar?  Or what, more specifically, are you

22 talking are the precursor chemicals you found?

23 A     We found just a large variety of precursors, and which

24 include things like -- that you wouldn't normally have around

25 the house, in my training and experience, which means ammonium

Cipriano - Cross / By Mr. Butcher                    15

1  nitrate, sulfuric acid, aluminum powder, citric acid in

2  quantities that aren't intended for home use, and there were a

3  variety, just a large variety of precursors, and they could be

4  used to make a number of different primary and secondary

5  explosives.

6  Q    But they're all legal substances.  There is no requirement

7  to have a license for any of those.

8  A    Correct.

9  Q    What was the strength of the sulfuric acid and the citric

10  acid?

11  A    I don't recall the exact concentration.

12  Q    Okay.  Now, as to triggers, are you talking about clocks,

13  or what are we talking specifically about triggers?

14  A    Timers, a remote control device --

15  Q    Okay.  Once again, can you be more -- are we talking,

16  like, a kitchen timer, or are we talking about something more

17  sophisticated?

18  A    Something akin to a kitchen timer.

19  Q    Okay.  And what else?  I'm sorry.

20  A    A remote control device and various circuitries and

21  circuit boards.

22  Q    Okay.  A remote control device; do you mean like a

23  television remote or a -- I mean --

24  A    There -- there was a remote control and there was also a

25  drone --

Cipriano - Cross / By Mr. Butcher                    16

1   Q    Oh, so, you --

2   A    -- a remote-controlled drone.

3   Q    Okay.  So, you mean, like, a remote that would control a

4   drone?

5   A    There was a remote separate from the drone.

6   Q    Okay.  Okay.  I'm asking a bad question.  What was it a

7   remote to?  What kind of thing did the remote control if you

8   had the other part to it?

9   A    I don't know what the other part it was to.

10  Q    Okay.  And containers; what kind of containers are we

11  talking about, just --

12  A    There was empty -- a large quantity of empty tin cans;

13  there was cardboard tubing wrapped in duct tape; things like

14  that.

15  Q    Okay.  Was there any other personal effects in there, like

16  clothes, old televisions, things like that?

17  A    There was a variety of other personal effects in there,

18  yes.

19  Q    Can you explain?  Can you tell us what those other things

20  were like?

21  A    I can tell you that there was clothing and various other

22  things, which, frankly, I didn't pay too much attention to,

23  because we were looking for evidence.

24  Q    Normal household stuff that you might find someplace?

25  A    I don't know what you mean by "normal household stuff."

Cipriano - Cross / By Mr. Butcher                    17

1   Q    Okay.  Well, was there, like, furniture in the storage

2   locker?  How big was the storage locker?

3   A    I didn't take measurements.

4   Q    Well, are we talking, like, a two-by-four-inch closet or

5   are we talking, like, 20 by 20?

6   A    I wouldn't -- I wouldn't guess, but it's closer to a

7   smaller storage container.

8   Q    Okay.  Now, you said that you found a barrel and bolt

9   carrier.  Where were those found?

10  A    They were found in a box in the storage container.

11  Q    Okay.  Were they already assembled or were they two

12  separate parts when you found them?

13  A    They were assembled.

14  Q    Okay.  Where was this box?

15  A    It was located in the storage container.

16  Q    In the back?  In the front?

17  A    I don't know the exact location.

18  Q    Was there stuff on top of it or was it by itself?

19  A    When the unit was cleared, it was cleared by our EOD

20  element because of the presence of explosives, or potential

21  presence of explosives.  Therefore, the items were taken out

22  prior to us examining them in place.

23  Q    And, so, photographs were not taken at the -- at the time

24  before things were taken out?

25  A    Photographs were taken.

1   Q    Okay.  But you don't know where the -- the box containing

2   the barrel and bolt was.

3   A    I know it was in the storage container.

4   Q    Okay.  Now, the barrel and bolt -- are you suggesting that

5   this was handcrafted by Mr. Schiffmiller or somebody else, or

6   was this actually a piece taken off of another gun at some

7   point?

8   A    If you mean by "handcrafted" was it modified from an

9   original firearm, then, yes, it was modified from an original

10  firearm.

11  Q    No, that's not what I mean.  You said that -- you gave the

12  impression that this was, like, created out of nothing.  So,

13  was this -- I understand that you're saying that this is not in

14  its original state.  What I'm saying is, is -- was this from a

15  gun that you know what type of gun it was from?

16  A    Yes.

17  Q    And what type of gun was that?

18  A    A .410 shotgun.

19  Q    All right.  Smith and Wesson?  Remington?  Brownie?  I

20  mean, do you know the manufacturer?

21  A    There are a variety of manufacturers of .410 shotguns.  I

22  wouldn't speculate.

23  Q    Okay.  Now, this was a bolt-action .410?

24  A    Correct.

25  Q    So, it would only be able to shoot one shot at a time?

```
                   Cipriano - Cross / By Mr. Butcher          19
```

1   A    Correct.

2   Q    And that -- are you suggesting that this .410 was either

3   made in or outside of -- was this made in New Mexico, or do you

4   know where it was made?

5   A    I don't know where it was made.

6   Q    So, it could have been made in New Mexico?

7   A    I don't know.

8   Q    Do you know where, if it had a serial number, where the

9   serial number should have been on it?

10  A    Could you repeat the question?

11  Q    Well, once -- once again, it's -- I guess I'm somewhat

12  confused.  So, you're not claiming this was, like, a Remington,

13  whatever, shotgun that was modified.  You don't know what it

14  was at all?

15  A    The -- the shotgun was modified as such that the

16  manufacturer's markings were not on it.

17  Q    Okay.  And this bolt and barrel was just in a -- in a box

18  in the storage locker, correct?

19  A    Correct.

20  Q    Was there any ammunition in it or by it or on it?

21  A    There was not ammunition, .410 ammunition, no.

22        **MR. BUTCHER:**  Okay.  One moment, please, your Honor.

23        **(Pause; voices and whispers off the record)**

24        **MR. BUTCHER:**  Thank you.  No further questions.

25        **THE COURT:**  All right.  Do you have any follow-up?

1      **MR. KRAEHE:**  I have no follow-up on the issue of

2  probable cause, your Honor.  I may recall the witnesses --

3  witness for purposes of the detention hearing later.

4      **THE COURT:**  Okay.

5      You can step down, but please remain present in case

6  you are called as a witness on detention.

7      **THE WITNESS:**  Okay.

8   **(Witness stepped down)**

9      **MR. BUTCHER:**  We have no evidence to present for the

10  issue of probable cause, your Honor.

11      **THE COURT:**  Okay.

12      **MR. KRAEHE:**  Nothing further, your Honor.

13      **THE COURT:**  All right.  Based on the testimony in

14  court today, I find that there is probable cause to support

15  both charges in the criminal complaint.  Specifically, there is

16  probable cause to believe that Mr. Schiffmiller committed the

17  crime of possession of a firearm made in violation of 21 United

18  States Code Chapter 53, in violation of 26 United States Code

19  Section 5861(c), as well as probable cause to believe that

20  Daniel Schiffmiller committed the crime of possession of a

21  firearm which is unregistered, in violation of 26 United States

22  Code Section 5861(d).

23      All right.  Having found probable cause, this matter

24  will be -- will proceed, and we are also scheduled for a

25  detention hearing.

Cipriano - Direct / By Mr. Kraehe                    21

1          Now, I have reviewed the Pretrial Services report.  I

2    have also heard the testimony of the agent with regard to other

3    items that were in the storage unit, and I've certainly

4    considered that.

5          Does the Government want to present additional

6    evidence on detention, and how are we going to proceed with

7    regard to the detention hearing?

8          **MR. KRAEHE:**  Your Honor, we (indiscernible; recording

9    cuts out) ask for some additional evidence on -- as relates to

10   detention.

11         **THE COURT:**  All right.  Well, go ahead and recall

12   your witness, if Agent Cipriano is going to testify as to that,

13   or someone else.

14         And, Agent Cipriano, you're still under oath.

15         **THE WITNESS:**  Yes, your Honor.

16     **ANTHONY CIPRIANO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

17                    **FURTHER DIRECT EXAMINATION**

18   **BY MR. KRAEHE:**

19   Q    Agent Cipriano, did you find anything in the storage

20   locker that we discussed earlier in connection with the

21   probable cause hearing that would indicate to you that the

22   person who was in possession of those items had any plans to

23   build explosives?

24   A    Yes.

25   Q    Can you describe what those items were?

**EXCEPTIONAL REPORTING SERVICES, INC**

1           **MR. BUTCHER:**  Well, your Honor, I'd like to know the

2    foundation.  I mean, he's made a conclusion of probability of

3    explosives.  I'd like to know why he thinks that, at least.

4           **THE COURT:**  Well --

5    **BY MR. KRAEHE:**

6    Q    Did you find anything in the course of your investigation

7    of Mr. Schiffmiller that indicated any -- any plans to build

8    explosives?

9    A    Yes.

10          **THE COURT:**  Don't testify about what you've already

11   testified to, because I think a foundation has been laid

12   already as to that.  You've testified to a large variety of

13   items that were in the storage locker.  You testified that

14   there were books and written documents regarding manufacture of

15   explosives -- explosives and explosive devices, so I don't want

16   you to re-testify to what you've already testified to.

17   However, if there is additional information that will lay a

18   foundation for why it is that you concluded that the person who

19   possessed those items had plans to make explosives, go ahead

20   and testify as to that, and then you can ask your questions.

21   But I think there was a question -- I just don't want you to

22   reiterate what you've already said.  I've heard the testimony,

23   and I don't need you to restate it.

24          **THE WITNESS:**  I --

25          **MR. KRAEHE:**  If I can assist, your Honor.

1           **THE COURT:**  Yes.

2   BY MR. KRAEHE:

3   Q    Did you find anything in writing regarding the making of

4   explosives?

5   A    Yes.

6   Q    Can you describe what was in those writings?

7   A    Found in the storage container were handwritten notes

8   entitled "The Preparatory Manual for Explosives" that

9   indicated -- that talked about the construction of IED's,

10  improvised explosive devices, and improvised incendiary

11  devices.

12  Q    Did these writings in any way describe how explosives are

13  made or what the contents of explosives are?

14  A    So, recovered separately, from Katherine Bueler, Daniel's

15  mother's, home, was a notebook which included recipes for both

16  primary and secondary explosives.

17  Q    And did you find anything that gave you concern regarding

18  whether there are any plans for using these explosives?

19  A    There -- there was a handwritten document recovered from

20  the storage container which appeared to be song lyrics, or

21  something akin to that, which referenced a description which

22  sounded very much like an explosion.

23          **MR. KRAEHE:**  Okay.

24          Your Honor, with your permission, just to refresh the

25  witness's recollection as to what he found, I would --

1          **THE COURT:**  Okay.  Why don't you show defense counsel

2     and see if he has any objection.

3          **(Pause)**

4          **THE COURT:**  I think you could just lay a foundation

5     for that document being utilized to refresh the recollection.

6          Do you have any objection, Counsel?

7          **MR. BUTCHER:**  Uh, for the purposes of this hearing,

8     not -- we have no objection to using the document to refresh

9     his recollection.

10         **THE COURT:**  Okay.  But if you could just lay a

11    foundation with that document -- are you showing him a copy of

12    a document that was seized?

13         **MR. KRAEHE:**  You know, what I'll do, your Honor, is

14    I'll just go ahead and make it an exhibit.

15         **THE COURT:**  Okay.

16         **MR. KRAEHE:**  I don't have any exhibit stickers, so if

17    I could just write on it.

18         **MR. BUTCHER:**  For the purposes of this hearing we'd

19    have no objection.

20         **THE COURT:**  Okay.

21         **(Pause; voices and whispers off the record)**

22         **THE COURT:**  All right.

23    **BY MR. KRAEHE:**

24    Q    And, so, Agent Cipriano, I'm handing you what I've marked

25    as Plaintiff's Exhibit 1.  Can you describe that, please, for

Cipriano - Direct / By Mr. Kraehe                    25

1   the Court?

2   A    Yes.  It appears to be a poem or song, and the passage in

3   question, "A sudden quake bringing homes to ground while

4   people" --

5   Q    Before you read that -- before you read that --

6   A    Yes.

7   Q    -- can I ask you where you found that?

8   A    This was found in the storage container.

9   Q    Okay.  And this is the same storage container that we

10  described earlier?

11  A    Yes.  That's correct.

12  Q    Okay.  All right.  And was that laying around loosely or

13  was it part of some other collection of writings?

14  A    I don't know exactly where it was found.

15         **MR. KRAEHE:**  Okay.  For purposes of this hearing I

16  would ask that that be admitted for the Court's consideration.

17         **MR. BUTCHER:**  No objection for the purposes of this

18  hearing.

19         **THE COURT:**  All right.

20  **BY MR. KRAEHE:**

21  Q    Can you please read that to the Court?

22         **THE COURT:**  The document, Exhibit 1, will be

23  (indiscernible; audio cuts out)

24      **(Government's Exhibit Number 1 was received in evidence)**

25  //

1      **THE WITNESS:**  "A sudden quake bringing homes to

2      ground while people scream, cry, and die.  I wish

3      them well.  I tried to help."

4  **BY MR. KRAEHE:**

5  Q    Okay.  In the course of your investigation did you learn

6  whether Mr. Schiffmiller had previously been arrested?

7  A    Yes.

8  Q    And did you learn what the facts of that -- that arrest

9  were?

10  A    Yes, I did.

11  Q    Okay.  Can you tell the Court what you know about that

12  particular arrest?

13  A    On August 20th of this year Daniel was arrested by

14  Santa Fe Police Department while, according to the officer's

15  report, he had been taping the officer, who was in the process

16  of conducting a traffic stop on a unrelated third party.  He

17  ignored the officer's commands to halt and came closer while

18  recording him with his cell phone, and after checking that

19  traffic was clear, he charged the officer, who, in the process

20  of subduing him, placed him in handcuffs.

21  Q    And was Mr. Schiffmiller arrested at that time?

22  A    Yes, he was.

23  Q    And the arrest was for what?

24  A    Assault of a police officer -- assault of a peace officer

25  and two counts of carrying a concealed deadly weapon.

1   Q     And what was that concealed deadly weapon that

2   Mr. Schiffmiller was carrying?

3   A     He had two 9-millimeter firearms on him at the time.

4   Q     In the course of the search of Mr. Schiffmiller's storage

5   unit did you find any other firearms other than the one that is

6   made the subject of the complaint?

7   A     There were components of an AR-15.

8   Q     During the course of your investigation have you learned

9   whether Mr. Schiffmiller is affiliated with any extremist

10  groups?

11  A     Yes.  I believe that Mr. Schiffmiller ascribes to

12  sovereign --

13          **MR. BUTCHER:**  Objection.  Two things.  Lack of

14  foundation as how he would learn this, and, then, two, "extreme

15  groups."  I do not know what that would mean.  I mean, there

16  needs -- what is an "extreme group"?  It could be anything.

17  So, a lack of foundation and lack of -- form of the question.

18          **THE COURT:**  All right.  Why don't you just ask if the

19  agent obtained any information during his search or during his

20  investigation indicating that Mr. Schiffmiller ascribes to any

21  group and, if so, what group that is.

22  **BY MR. KRAEHE:**

23  Q     To your knowledge, does Mr. Schiffmiller ascribe to any --

24  well, let me ask you this.  Does Mr. Schiffmiller ascribe to be

25  a member or a follower of "sovereign citizens"?

Cipriano - Direct / By Mr. Kraehe                    28

1   A    A follower of the "sovereign citizen" ideology, yes.

2   Q    Okay.  And just briefly if you could describe what the

3   "sovereign citizen" ideology is.

4   A    Sure.  It's -- it's an ideology that's based on a very

5   conspiratorial view of U.S. history and very unique

6   interpretations of legal texts, the primary impact of it being

7   that the subject feels that they are not under the jurisdiction

8   of the federal -- of federal, state, or local governments.

9   Q    Okay.  And is this of concern to you in your capacity as a

10  FBI agent?

11  A    Yes, it is.  It's a domestic terrorism priority for the

12  FBI.

13  Q    And what evidence did you come across that indicates to

14  you that Mr. Schiffmiller is a follower of this ideology?

15  A    Well, in addition to his conduct with me personally, which

16  included acting as though he did not understand Miranda rights

17  and asserting himself as "a man," which he also did in this

18  courtroom on Friday, the documentation that he was carrying

19  with him while he was arrested by the Santa Fe Police

20  Department included a driver's license with a sticker which

21  identified him as a peace traveler and a sovereign.  And this

22  is all rhetoric that is very common in the sovereign citizen

23  movement.

24  Q    And other than Mr. Schiffmiller's conduct at the hearing

25  on Friday, is there any indication that Mr. Schiffmiller

1    continued to engage in sovereign citizen activities after he

2    was arrested by the Santa Fe Police Department?

3    A    He continued to associate with other people who ascribe to

4    sovereign citizen ideology.

5    Q    And if you could describe for the Court in more detail how

6    you know that.

7    A    I had listened to -- or read transcripts of telephone

8    conversations between Daniel and other individuals who ascribe

9    to that ideology.

10   Q    And this was even after his arrest by the Santa Fe Police

11   Department.

12   A    That's correct.

13   Q    Okay.  And was Mr. Schiffmiller, after his arrest by the

14   Santa Fe Police Department, was he placed on supervised release

15   pending --

16   A    Yes.

17   Q    -- pending trial in that matter?

18   A    Yes.

19   Q    And were those conditions revoked at some point?

20   A    They were.  Yes.

21   Q    Okay.  And do you know why they were revoked?

22   A    They were revoked based on information provided to the

23   magistrate court on his activities involving explosives.

24   Q    Okay.  To your knowledge, did Mr. Schiffmiller engage in

25   any activity indicative of making explosives during the time

Cipriano - Direct / By Mr. Kraehe                    30

1   that he was on supervised release?

2   A    Yes.

3   Q    And what activities were those?

4   A    He was attempting to condense sulfuric acid as part of a

5   component for an explosive.

6   Q    And where was he doing that?

7   A    In his father's home.

8   Q    And did he use any particular container in order to

9   condense the sulfuric acid?

10  A    He was using a boiler.  I don't know what type of

11  container.

12  Q    Okay.  And just to clarify, did you at any time during

13  your investigation find anything that appeared to be shrapnel?

14  A    Yes.

15  Q    Okay.  Where did you find that?

16  A    Both in the father's home and also in the storage

17  container, a bucket of metal pellets.

18  Q    And how large was that bucket?

19  A    It was a sizable bucket.  I don't know how large.

20  Q    Okay.  And what is the purpose of shrapnel?

21  A    It's to inflict additional casualties.  Its only purpose

22  is to hurt and kill.

23          **MR. KRAEHE:**  Okay.  I have nothing further, your

24  Honor.

25  //

**FURTHER CROSS EXAMINATION**

BY MR. BUTCHER:

Q    Sovereign citizens, by itself, is not a violent

organization or a violent belief.

A    It's not really an organization, and its belief is -- I

mean, it encompasses a wide range of activities, all the way

from tax protesters, white-collar fraud, all the way to mass

casualty assaults.

Q    And, in fact, they often run afoul in front of courts

because they've just refused to pay their taxes.

A    In some instances.

Q    Right.  And in some instances they only -- not believe in

the federal government, but they could believe they're --

they're part of -- or they belong to the Republic of New Mexico

or the Republic of Kansas.  So, I mean, not all sovereign

citizens believe that there is no lawful government.

A    There's many different variations --

Q    Right.

A    -- of the ideology.

Q    And what specifically makes you think -- well, what

specifically do you think Mr. Schiffmiller believes?  I mean,

you say he associates as, but how can you know what he

believes?

A    I just am basing it on my training and experience, and

when I hear Daniel proclaim himself as "a man" in front of the

1   Court and distancing himself from the entity in that complaint,

2   I know that he's referring to, or my belief is that he's

3   referring to, a "straw man," which is the corporate fiction

4   that he believes has been created by the U.S. Government and is

5   actually referenced in my complaint in his name in all capital

6   letters.

7   Q    Okay.  But there are sovereign -- well -- now, the charges

8   that he was arrested for in Santa Fe were all misdemeanors,

9   correct?

10  A    Correct.

11  Q    And that -- his pretrial release was revoked due to this

12  case.

13  A    Correct.

14  Q    So, it wasn't like he committed a new crime; it's that you

15  went back to court and said that you had these other suspicions

16  about him.

17  A    Well, based on evidence.

18  Q    Yes.  And, so, he was compliant with the conditions of

19  release in the sense he was reporting in as directed and doing

20  what the probation officer or pretrial officer in the state was

21  telling him to do.

22  A    I don't think compliance included attempting to create a

23  precursor for an explosive.

24  Q    But he was recognizing the authority.  I mean, he -- I

25  understand you have your personal opinion, but the bottom line

Cipriano - Cross / By Mr. Butcher                    33

1   is he respected the authority of the state pretrial office.

2   A     No.  I don't think so.

3   Q     All right.  So, he stopped reporting to the state pretrial

4   office?

5   A     No.  He was acting in direct violation to the

6   conditions --

7   Q     No, no --

8   A     -- which were set.

9   Q     My question, officer, is, did he stop reporting to the

10  pretrial office?

11  A     Not to my knowledge.

12  Q     Did he tell them he was not going to follow the orders

13  anymore?

14  A     I don't know.

15  Q     Did he -- do you know what his conditions of pretrial

16  were -- are?

17  A     I know that they included no access to weapons.

18  Q     Okay.  Now, did he have access to firearms?  You're saying

19  he had access to firearms?

20  A     Yes.

21  Q     While he was on conditions of release?

22  A     Explain -- I'm sorry?

23  Q     When he was on pretrial release, you just said that he had

24  access to firearms or he got firearms while he was on pretrial

25  release.

1   A    He had access to firearms while on pretrial release, yes.

2   Q    And where was that?

3   A    It was in the storage container which he had access to.

4   Q    Now, what you said you found in the storage container was

5   parts to -- to -- to guns, firearms, correct?

6   A    In addition to the item that we're discussing today, the

7   modified shotgun, yes, there were AR-15 components.

8   Q    I understand that you said there was a bolt and a barrel,

9   but there was no stock to that, correct?

10  A    Correct.

11  Q    And from a layman's point of view, that might be

12  considered to be a part of a gun.

13  A    Not really concerned what a layman's interpretation of it

14  is; we're concerned with the Chapter 53 National Firearms Act

15  and how that defines it.

16  Q    Okay.  And, once again, was there .410 shotgun shells

17  there?

18  A    No.

19  Q    So, it was not in a usable ready position in the sense

20  that he would have had to go out and get bullets to use it or

21  shotgun shells.

22  A    The weapon was capable of being fired.

23  Q    Well, not without -- all right.  So, a gun without a

24  shot -- a shotgun without a shotgun shell could be fired?

25  A    Well, it's capable of firing.

Cipriano - Cross / By Mr. Butcher                                      35

1   Q    Well, but that was not my question, was it?  I mean,

2   Officer, I understand that you kind of don't want to agree with

3   me.  But when I ask you a fair question, I expect a fair

4   answer, okay?

5   A    Fair enough.

6   Q    So, there was no shotgun shells in the storage container.

7   A    No, there was.  There were 12-gauge shotgun shells.

8   Q    Okay.  But there was no .410 shotgun shells?

9   A    No.

10  Q    And you could not use a 12-gauge shotgun in a four -- a

11  12-gauge shotgun shell in .410.

12  A    Not to my knowledge.

13  Q    Now, when you said that there was shrapnel, what are --

14  what are you -- are you talking about BB's?

15  A    Metal pellets.

16  Q    And what do you mean by "metal pellets"?

17  A    I'm not sure how to describe that further.

18  Q    All right.  And if I wanted to buy these metal pellets,

19  what might I look for under eBay or Amazon?  I mean, what are

20  these metal pellets?

21  A    Not trying to be difficult, but I would go with "metal

22  pellets."

23  Q    Okay.

24  A    Yeah.

25  Q    I'm not trying to be (indiscernible).  So, these were not

Cipriano - Cross / By Mr. Butcher                                        36

1   just, like, BB's; these were something different than BB's?

2   A    No, they were different than BB's.  Yes.

3   Q    Okay.  Did they look to be homemade or did they look to be

4   commercially made?

5   A    I don't know.

6   Q    Okay.

7        **(Pause)**

8            Now, was his parents -- I think you've talked --

9   you -- you've searched and talked to both of his parents.  Were

10  they cooperative with you?

11  A    Yes.

12  Q    Now, as to the song, which -- which I believe there was a

13  reference to a chorus, probably more accurately a song --

14  that's just your interpretation that it meant to be some kind

15  of explosion?

16  A    My interpretation was that it sounded --

17  Q    Right.

18  A    -- like it was meaning an explosion.

19  Q    And someone else could read that and maybe interpret it to

20  be an earthquake.

21  A    I don't know what someone else might interpret it as.

22  Q    All right.  And I think there is some confusion.  I --

23  now, how to build a bomb; I mean, you can go on the internet

24  and find that out, a lot of information about how to build a

25  bomb.

Cipriano - Cross / By Mr. Butcher                     37

1   A    (indiscernible; audio cuts out)

2   Q    And also books and survival pamphlets; you can go to a lot

3   of specialty bookstores and get all kinds of things about how

4   to build bombs, IED's, and things like that.

5   A    Yes.

6   Q    Now, there is some indication that between the song and

7   the stuff you found that there was some sort of imminent

8   thought that he was going to use it.  I mean, do you have any

9   evidence from what you found in the storage locker or these

10  papers that there was an imminent intent to make a bomb and use

11  it?

12  A    I don't know if it was an imminent intent or not.

13  Q    So, basically, all you found was just how to make bombs

14  and then this song lyric.

15  A    How to make bombs and every component necessary in which

16  to do so.

17  Q    And, then, once again, I mean, a lot of us could have a

18  lot of those components already.  I mean, like I said, there

19  have been cases brought where one of the components -- main

20  components of a grenade was sugar.

21  A    In this instance there was also written documentation --

22  Q    Right.

23  A    -- indicating a desire to, an intent to create explosives.

24  Q    And what document was that, that he had intent to create

25  explosives?  Because there's not that in that song.

Cipriano - Cross / By Mr. Butcher                    38

1   A    No.  It's a notebook recovered from Katherine Bueler's

2   home, which had recipes for explosives, as well as the notebook

3   recovered from the storage manual, which had listings of IED's

4   and incendiary devices.

5   Q    Right; and that's just a how-to, not an intent -- those --

6   those just go to how to create stuff.

7   A    Well, I think it could go to both.

8   Q    Well, no, no; I don't want your opinion.  I want what was

9   actually on those pages of those things.  So, you're saying

10  that there's some kind of writing in that, that was going to

11  say, "I'm about to do this now; I plan to use it against" --

12  so-and-so?  Or it's just all this is how to do this?

13  A    I would define it as more than just how to do this, as --

14  Q    Specifically, what passages are you defining to be more

15  than just a how-to?

16  A    I think having it written down demonstrates intent.

17  Q    Well, that's just your opinion.  I'm asking you what the

18  facts are.  Without your opinion, what was written down?  Was

19  there anything more than how to do something written down?

20  A    No.

21  Q    So, when you're saying that there was an imminent intent

22  to do this, that's just your opinion.

23  A    I didn't say anything about imminence.

24  Q    Well, I believe it was part of the question, but let's

25  just say -- but when you were making the assumption that there

Cipriano - Cross / By Mr. Butcher                    39

1   was intent to do this, that's just your assumption.  There was

2   nothing written down in those documents that said that.

3   A    The investigation is still ongoing.

4   Q    In the documents that you're aware of, Officer.

5            **THE COURT:**  Hey, I'm going to ask you to -- to --

6   this has been asked and answered.  It's clear that he has

7   formulated an opinion about intent based on the writings and

8   the material being together, and he hasn't said anything

9   further about the writings containing anything beyond recipes.

10           **MR. BUTCHER:**  All right.  And that's the -- the

11  understanding I -- I think, given the original question

12  directed, it was something that went further than that, your

13  Honor, but if that's what the understanding is, I will leave it

14  alone.  I have no further questions.

15           **THE COURT:**  Okay.

16           **MR. BUTCHER:**  Wait; one minute, your Honor, please.

17           **MR. KRAEHE:**  We have no further questions of this

18  witness, your Honor.

19       **(Pause; voices and whispers off the record)**

20           **MR. BUTCHER:**  Nothing -- nothing further, your Honor.

21           **THE COURT:**  All right.

22           **MR. BUTCHER:**  But I do have argument as to release.

23           **THE COURT:**  All right.

24           You may step down.

25           **THE WITNESS:**  Thank you.

40

1          THE COURT:  Thank you.

2     (Witness stepped down)

3          THE COURT:  Why don't I hear from Mr. Butcher on his

4   arguments with regard to release.

5          MR. BUTCHER:  Your Honor, first of all, I do not

6   believe the presumption applies in this case, so the issue is

7   whether Mr. Schiffmiller is a flight risk or a danger to the

8   community.

9          I do not believe that he's a flight risk.  His

10  parents are here.  He has long connections to New Mexico, to

11  the Santa Fe area, and, you know, the fact that he may have or

12  may not have certain political beliefs does not mean that he

13  should be kept in custody.  This Court is well aware I've

14  had -- I'm not sure that it's sovereignty, but assuming that

15  this is a sovereign case, this Court has had sovereign cases

16  before where the individuals have been compliant with the

17  pretrial release.

18          Now, as to assessment of danger, your Honor, you

19  know, the officer may have his opinions about things, but the

20  bottom line is there is nothing, you know, in having these

21  writings that are available on the internet, by itself, is a

22  danger to the community.  What I would ask that this -- the

23  Court do is place him in the La Posada halfway house.  That

24  would assure that he's under the maximum supervision, that he

25  does not -- that his comings and goings are monitored, and that

1    he will be here in Albuquerque versus Santa Fe.

2            I will also note that Mr. Schiffmiller has some

3    mental health issues, that I am concerned that his current

4    incarceration will lead to a deterioration of some of his

5    mental health issues.  If he's in the La Posada halfway

6    (recording cuts out; indiscernible) that he needs.  And I think

7    this is important; that, you know, as -- in talking to his

8    parents, that they're trying to find inpatient treatment for

9    him, but certainly he's not going to get any inpatient

10   treatment of any significance while he's incarcerated.  And to

11   have his possible condition deteriorate I think would not

12   benefit Mr. Schiffmiller or this case, nor the cause of

13   justice.

14           The bottom line is, is, you know, the -- he had --

15   despite whether, you know, whether it's under the statute or

16   not to be a complete gun -- something that a lay person would

17   consider gun parts.  You know, we're not in a place that one

18   would have easy access to it.  Once again, it's -- you know,

19   what happened in Santa Fe, he got -- you know, that

20   (indiscernible) dismissing their charges.  I assume that

21   they'll probably go the way of the buffalo to the federal case.

22   But, once again, is I think that Mr. Schiffmiller should be

23   released to the halfway house under very restrictive

24   conditions, that we can get him into the mental health

25   treatment he needs, which may -- which I think needs to be done

42

1    in this case.

2         I don't see the point of, once again, to incarcerate

3    him, because I don't see that he is an imminent threat to the

4    community in general.  You know, he photographed a police

5    officer; the police officer took umbrage to that, and something

6    ensued, (indiscernible) on the police officer, or that he used

7    the weapons in an offensive way.

8         Once again, these -- this allegation is that in a

9    box, we're not sure where, in a storage locker there was a bolt

10   and a barrel to a .410 shotgun but no shot -- .410 shotgun

11   shells.  There was parts to another gun, which -- what I think

12   would be argued that there's parts to a AR-15, that someone

13   might consider this to be parts.  While this is troubling, it

14   should be separated from this, but -- there is no point that he

15   needs to be completely incarcerated to address the legitimate

16   concerns of the Government and the Court.

17        We would ask that you put him in the La Posada

18   halfway house, that you leave him here in Albuquerque, that you

19   restrict his travel to Bernalillo County, (indiscernible; audio

20   cuts out), but, more importantly, that you order that he go

21   into mental health treatment, both as a condition of -- of --

22   that he do have an evaluation, but go into treatment, and also

23   I can guarantee his parents are also seeking additional and

24   have some resources to get him additional mental health

25   treatment.  But I think he's not a danger if he's in the La

1    Posada halfway house, and, more importantly, I think that he

2    does need -- has some mental issues that need to be addressed

3    in this case, that I think having him in jail will not get

4    addressed.

5              And he's -- you know -- I understand this is

6    troubling, but I don't know if, you know, they've really made

7    the step that this is a danger that cannot be monitored.  You

8    know, there's a lot of people out there that have how-to guides

9    on how to make bombs.  It does not mean that they go and use

10   them.  You know, while this one part is what it is and we'll

11   deal with that down the road, that by itself does not have a

12   presumption of detention; as I said, the La Posada halfway

13   house here in Albuquerque would assuage the Court in the

14   reasonable conditions that he's not a danger to the community.

15             Thank you, your Honor.

16         **THE COURT:**  All right.  I find by a preponderance of

17   the evidence that Mr. Schiffmiller is a flight risk and by

18   clear and convincing evidence that he is a danger to the

19   community.  I've heard the testimony.  I've considered all of

20   the factors in 3142.  I've reviewed the Pretrial Services

21   report.  I've noted the criminal history, which involves a

22   recent arrest and allegations of assault on a peace officer

23   while carrying two weapons.  Based on the totality of

24   information that I have in front of me I find that there are no

25   conditions under which Mr. Schiffmiller can be released that

1    would adequately mitigate the risk of dangerousness and flight

2    that he poses.

3            And I'll just note that Mr. Schiffmiller was in front

4    of me on Friday, and it was very clear to me that

5    Mr. Schiffmiller, while he understood the charges, refused to

6    recognize that the charges were against him.  Given the

7    sovereign citizen ideology that he ascribes to and given his

8    continued refusal after a lengthy hearing to recognize that

9    these charges were against him, I have very real concerns that

10   he would recognize the authority of the Court to impose any

11   conditions that he would be obligated to comply with.

12           Mr. Schiffmiller, you are remanded to the custody of

13   the Marshal Service pending resolution of these charges against

14   you.  You have the right to appeal the detention order.

15           Now, with regard to your concerns about his mental

16   health status, we, of course, have available federal medical

17   centers, and if you are concerned that Mr. Schiffmiller has

18   mental health conditions that are going to require more

19   treatment, you can certainly file a motion with the Court

20   either for transport for hospitalization or for a competency

21   evaluation.  But I can tell you, based on my lengthy

22   interaction with Mr. Schiffmiller on Friday, I believe that he

23   is competent.

24           **MR. BUTCHER:**  Your Honor, just for the record, I was

25   going to ask the Court, would the Court reconsider it if we

1   could get him in inpatient mental health treatment; but how I'm

2   reading what the Court is saying, even that circumstances would

3   probably not change the Court's mind?

4           **THE COURT:**  That would not change my mind, no.

5           **MR. BUTCHER:**  Very well.  Thank you, your Honor.

6           **THE COURT:**  Certainly he has the right to appeal my

7   detention order.

8           **MR. BUTCHER:**  Right.

9           **THE COURT:**  All right.  Is there anything further on

10  this matter?

11          **MR. KRAEHE:**  Nothing further, your Honor.  May I be

12  excused?

13          **THE COURT:**  You may.

14          **MR. BUTCHER:**  No, your Honor.

15          **THE COURT:**  Of course, if you want to pursue

16  inpatient treatment at the Bureau of Prisons, file any

17  appropriate motion.

18          **MR. BUTCHER:**  I understand, your Honor.

19       **(Proceeding was adjourned at 12:49 p.m.)**

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.




_____                  October 27, 2016_


                    TONI HUDSON, TRANSCRIBER